## Rice *et al.* *v.* Ege *et al.*

(*Circuit Court, N. D. New York.* June 30, 1890.)

AMENDMENT OF PLEADINGS—LACHES.
    In an action against several defendants upon a contract signed by one of them for the benefit of all, a joint answer was interposed which practically admitted the execution of the contract. Six years after the making of such answer, and after the evidence had all been taken, and some of the witnesses had died, one of the defendants asked leave to file an amended answer denying the authority of his co-defendant to execute the contract for him. *Held,* that the application came too late.

At Law. On motion by defendant Milo C. Treat for leave to amend answer or to serve a supplemental answer.

*Hamilton Ward,* for plaintiffs.

*Charles H. Brown* and *John E. Brandegee,* for defendant Treat.

COXE, J. This action was originally commenced in the supreme court of the state of New York in November, 1883, and was removed by the defendants, who are citizens of Pennsylvania, to this court in May, 1884. The summons was served personally and by publication upon the defendant Milo C. Treat. The service was completed February 20, 1884, and, no answer having been served, judgment by default was entered against all of the defendants. This default was opened on the 21st of April, 1884, upon the verified answer interposed on behalf of all the defendants, the affidavit of Charles H. Brown, who has since acted as counsel for Treat, and upon the affidavits of William Armstrong, the law partner of Brown, and Joseph A. Ege, one of the defendants. The latter made the affidavit of merits and verified the answer. Pursuant to stipulation the testimony was taken out of court, the right to objection being reserved until the trial. The taking of testimony commenced on the 24th of April, 1885, and was concluded May 18, 1886. This motion for leave to amend was not made until the cause came on for trial at the Utica term on the 31st day of March, 1890.

In order to appreciate the character of the motion a brief review of the facts is necessary. The plaintiffs, at the time in question, were co-partners under the name of the Friendship Oil Company. Prior to the 1st day of July, 1881, the parties to the suit had various transactions in leases of oil lands in Allegany county, N. Y., which they held as tenants in common. On that day a settlement was effected and the leases were divided between them. In this division the plaintiffs took the leases of the Nelson and Dodson farms, upon which oil wells had been started, and where it was expected oil would be found, but the value of the wells had not been demonstrated at the time of the settlement. The theory of the settlement was that if these wells proved productive the division of the leases was an equitable one. If they proved unproductive the defendants would have an undue advantage, they having received the Richardson lease covering property of ascertained value. To meet this contingency it was agreed that if the wells then being drilled on the

Nelson and Dodson farms proved failures the defendants would pay the plaintiffs $1,000 to equalize the settlement. The agreement upon which the plaintiffs sue is as follows:

"This agreement, made this 1st day of July, 1881, between J. A. Ege, H. B. Huff and M. C. Treat of the first part, and the Friendship Oil Company of the second part, witnesseth: That, whereas a settlement of various matters has been made between the parties hereto, it is hereby, for value received, agreed on the part of the parties of the first part that they will, if the well now being put down on the Nelson farm in Wirt proves to be unproductive as an oil-well, or not a paying well, and the well on the Dodson farm is not, the said first parties will pay to the second parties one thousand dollars; and in case either of those wells are good the parties of the second part shall assign to the parties of the first part the M. W. Taylor lease, dated July 2, 1879, recorded in Liber 1 of Leases, page 82, in Allegany Co., N. Y. A paying well, above referred to, shall mean a well in which oil is produced in paying quantities.

[Signed] "J. A. EGE for himself, H. B. Huff and M. C. Treat.
"THE FRIENDSHIP OIL COMPANY. By S. M. NORTON."

The complaint alleges and the plaintiffs contend that, after necessary tests, the wells on the Nelson and Dodson farms proved unproductive, and they bring this action to recover the $1,000 agreed to be paid, in that event, by the defendants. The answer admits that in the year 1881 the defendants were interested, as individuals, with the plaintiffs in the ownership of a large number of oil leases in Allegany county, N. Y.; "that a settlement was had of their affairs on or about July 1, 1881, and a division of said leases was made between the plaintiffs and defendants." The answer further contains the allegation "that the terms of said contract, and the understanding and agreement of the parties at the time of the execution thereof, required that the plaintiffs should have given the defendants an opportunity to examine said wells, and an opportunity to convince themselves as to the unproductiveness and non-paying qualities of said wells in said contract and the plaintiffs' complaint referred to, before they became liable, if at all, to pay the said sum of $1,000 referred to in said contract." The defendant Treat now asks that these clauses be stricken from the answer so far as they relate to him, and that an allegation be added denying the authority of the defendant Ege to execute the contract for him. He asks further that he be permitted to file a supplemental answer, sworn to March 18, 1890. This answer contains a general denial simply, except it admits that prior to July 1, 1881, the parties were owners of the oil leases as alleged in the complaint. It will be seen that the original answer, of 1884, practically admits the making of the contract by the defendants as alleged in the complaint, the defense there stated being, that the wells upon the Dodson and Nelson farms were not sufficiently tested to enable the plaintiffs to maintain their action. Upon the issue thus joined the testimony has all been taken, and the cause prepared for trial. The motion is opposed upon the ground of laches, and for the reason that since the testimony has closed several witnesses who could sustain the plaintiff upon the new issue have disappeared or are dead.

The court has not been furnished with an authority holding that an amendment of this kind is permissible after so long a lapse of time. It is entirely clear that the counsel who signed the original answer, and who have since acted for the defendant, must have been cognizant of its contents from the outset, and, even if Treat is correct in asserting that he was entirely ignorant of what had been done on his behalf until the hearing in 1886, he certainly must have had full knowledge at that time, but no reasonable excuse is given for his silence and inactivity during the four years intervening. It is too late after the proofs have all been taken, and the witnesses dispersed and dead, to change the issues upon which the case is to be tried. The rule in such cases is clearly stated in *Smith* v. *Babcock*, 3 Sumn. 583. Judge STORY says:

"When application is made to amend an answer in material facts, or to change essentially the grounds taken in the original answer, courts of equity are exceedingly slow and reluctant in acceding to it. To support such application, they require very cogent circumstances, and such as repel the notion of any attempt of the party to evade the justice of the case, or to set up new and ingeniously contrived defenses or subterfuges. * * * And it seems to me, that, before any court of equity should allow such amended answers, it should be perfectly satisfied, that the reasons assigned for the application are cogent and satisfactory; that the mistakes to be corrected, or the facts to be added, are made highly probable, if not certain; that they are material to the merits of the case in controversy; that the party has not been guilty of gross negligence; and that the mistakes have been ascertained, and the new facts have come to the knowledge of the party, since the original answer was put in and sworn to."

See, also, *Suydam* v. *Truesdale*, 6 McLean, 459; *Ruggles* v. *Eddy*, 11 Blatchf. 524; *Loom Co.* v. *Higgins*, 13 Blatchf. 349; *Medbury* v. *Swan*, 46 N. Y. 200; Fost. Fed. Pr. §§ 167, 168. Upon authority it would seem quite clear, therefore, that the amendment should be denied; certainly there is no precedent for granting it without the imposition of very stringent terms.

Furthermore, the plaintiffs ask, as they have an undoubted right to do, that, if the motion is granted, they be permitted to amend their complaint and take further testimony upon the new issue. Surely, it would be unfair to the defendant to require him to pay a large bill of costs, and subject him to the expense of further proceedings, unless it can be seen that the proposed amendment will inure to his advantage. Having read the entire testimony I am constrained to say that it would be unavailing. The amendment would take the question of Ege's authority from under the admission and make it an issuable one, but no amendment can remove from the record the fact that the original answer was filed, or the circumstances in which it was interposed. As evidence, these facts are well-nigh as disastrous to the defendant as though crystallized into a formal admission. The dilemma is a plain one. Let it be assumed for a moment that the defendant Treat is correct in his theory that Ege's acts were unauthorized. He swears that he was personally served with the summons. He knew—he must have known—that he was being sued on account of Ege's acts. He knew further that unless he

answered the complaint judgment would be taken by default. What then would have been his course tested by any rational standard? Surely confidence in Ege would have ceased with the commencement of this suit. There would have ben an angry interview, a sharp dismissal and no further joint undertakings. Treat would have retained his own lawyer, taking good care that he was not Ege's lawyer, and would have put in a separate defense. Having been betrayed once he would have been vigilant not to place himself in a position where he could be betrayed a second time. His answer would have exposed the fraud of which he was the victim and would have denounced the conspirators. But, on the other hand, if plaintiff's version is the correct one, Treat's conduct in leaving the defense to Ege is perfectly natural and in accordance with the rules which govern the actions of men. In other words, is not Treat's conduct in intrusting the defense to Ege in direct conflict with his present position that Ege's acts in making the contract and putting in the answer were without authority from him? A party sued on a forged note does not, usually, intrust the defense to the forger. It seems incredible that the action should have been commenced, the attachment levied, Messrs. Armstrong & Brown retained to defend, the judgment *pro confesso* entered, the answer prepared at Bradford, the home of the defendant, the default opened and issue joined, without Treat's knowledge and consent. Either he was cognizant of all this, or he has no standing in court, and the action so far as he is concerned is undefended. No such inference is permissible. The fact that the management of the defense was left solely to Ege is in harmony with the theory of the plaintiffs that he was the trusted agent of Treat and Huff as to their joint interests in Allegany county, that the answer states the defendants' strongest ground of defense, and that it did not occur to any one to dispute the authority of Ege until the turn of fortune's wheel made Treat the only responsible defendant. The motion is denied.